2:05-cv-70682-NCO-WC   Doc # 1   Filed 02/22/05   JUDGE : Meara, John Corbett   Pg 1 of 50   Pg ID 1

DECK  : Judge Prisoner Deck
DATE  : 02/22/2005 @ 14:55:45
CASE NUMBER : 2:05CV70682
IFP WADE V SAWHNEY (EW)

252

ORIGINAL

*Attachments*

**UNITED STATES DISTRIC...**
**EASTERN DISTRICT OF M...**
Theodore Levin United States ...
231 W. Lafayette, Room 564
Detroit, Michigan 48226 MAGISTRATE JUDGE CAPEL,

## *Prisoner Civil Rights Complaint for Cases Brought Under 42 U.S.C. § 1983*

| Plaintiff's Information | |
|---|---|
| *Name*  MONICA  ELAINE  WADE  #176714 | *Inmate Number* #176714 |
| *Place of Confinement*  ROBERT  SCOTT  CORRECTIONAL  FACILITY | |
| *Street*  47500  Five  Mile  Road   *City*  PLYMOUTH   *State*  MICHIGAN   *Zip Code* 48170 | |

*Any additional plaintiffs to this action should be listed on a separate 8 ½ x 11" sheet of paper and securely attached to the back of this complaint.  Please provide names, inmate numbers, and addresses for each plaintiff.*

| Defendant's Information *(This information must be current)* | |
|---|---|
| *Name*  DR. INDIRIA  SAWHNEY | *Position*  Medical  Doctor |
| *Street or P.O. Box Number*  ROBERT  SCOTT  CORRECTIONAL  FACILITY,  47500  Five  Mile  Road | |
| *City*  PLYMOUTH   *State*  MICHIGAN   *Zip Code* 48170 | |

**Are you suing this defendant in his/her personal or official capacity?**   **PERSONAL, INDIVIDUAL**

*Any additional defendants to this action should be listed on a separate 8 ½ x 11" sheet of paper and securely attached to the back of this complaint.  Please provide their names, positions, and current addresses.*

## I. PREVIOUS LAWSUITS

Have you begun any other lawsuits in state or federal court relating to your imprisonment?

YES  ☒          NO  ☐

Defendant:  Dr. VERMA UMESH

Position :  Medical Doctor

Address  :  Duane L. Waters Hospital
            Charles E. Egeler Correctional Facility
            3857 Cooper Street
            Jackson, Michigan, 49201

He is sued in his individual capacity.


Defendant:  Olivia Bruce

Position :  Unknown

Address  :  Huron Valley Complex
            3511 Bemis Road
            Ypsilanti, Michigan, 48197

She is sued in her individual capacity.


Defendant:  Tonya Watson

Position :  Resident Unit Manager (RUM)

Address  :  Robert Scott Correctional Facility
            47500 Five Mile Road
            Plymouth, Michigan, 48170

She is sued in her individual capacity.


Defendant:  V. Parker

Position :  Resident Unit Supervisor (ARUS)

Address  :  Robert Scott Correctional Facility
            47500 Five Mile Road
            Plymouth, Michigan, 48170

She is sued in her individual capacity.


Defendant:  Yolanda Sharfner-Butchee

Position :  Correctional Officer

Address  :  Robert Scott Correctional Facility
            47500 Five Mile Road
            Plymouth, Michigan, 48170

She is sued in her individual capacity.

If **"YES"**, complete following section; if **"NO"**, proceed to Part II.

*Please list all prior civil actions or appeals that you have filed in federal court while you have been incarcerated.[1]*

**1)**

| Docket Number: | No.  03-71673 |
|---|---|
| Name of Court: | UNITED STATES DISTRICT COURT   EASTERN DISTRICT OF MICHIGAN |
| Parties (Caption or Name of Case): | WADE v. BILL MARTIN |
| Disposition: | Dismissed in part with prejudice<br>Dismissed in part without prejudice |

**2)**

| Docket Number: |
|---|
| Name of Court: |
| Parties (Caption or Name of Case): |
| Disposition: |

**3)**

| Docket Number: |
|---|
| Name of Court: |
| Parties (Caption or Name of Case): |
| Disposition: |

*Note: Any additional civil actions should be listed on a separate sheet of 8 ½ x 11" paper.*

---

[1]This notification is pursuant to 28 U.S.C. § 1915(g).

*Prisoner Civil Rights Complaint — Page #2*

## II. ADMINISTRATIVE REMEDIES

1.    If you are in the custody of the State of Michigan or one of its subdivisions, did you:

File a grievance with the Step 1 Grievance Coordinator?    YES ☒    NO ☐
Appeal to the Step 2 Grievance Coordinator?    YES ☒    NO ☐
Appeal to the Step 3 Grievance Coordinator?    YES ☒    NO ☐

**\* PLEASE SEE ATTACHED COMPLAINT FOR INFORMATION ON EXHAUSTION**

2.    If you are a federal detainee, prisoner, or parolee and if your claim concerns parole, did you appeal to the National Appeals Board of the United States Parole Commission?

YES ☐    NO ☐

*If not, explain why:*

_____

_____

3.    If you are a federal detainee, prisoner, or parolee, and if your claim involves something other than parole, did you:

Attempt to resolve your complaint informally?    YES ☐    NO ☐
File a formal complaint?    YES ☐    NO ☐
Appeal to the warden?    YES ☐    NO ☐
Appeal to the Regional Director of the Bureau or Prisons?    YES ☐    NO ☐
Appeal to General Counsel for the Bureau of Prisons?    YES ☐    NO ☐

*If not, explain why:*

_____

_____

*Prisoner Civil Rights Complaint — Page #3*

## III. STATEMENT OF FACTS

State here as briefly as possible the facts of your case.  Describe how each defendant is involved.  Include the names of other people, dates, and places involved in the incident.  Do not give any legal arguments or cite any cases or statutes.  If you intend to allege a number of related claims, number and set forth each claim on blank 8½ x 11" sheets of paper and attach them to the last page of this complaint.

_____

_____

_____

**\*  PLEASE SEE ATTACHED COMPLAINT AND CLAIMS**

_____

_____

_____

_____

_____

## IV. RELIEF

State briefly and exactly what you want the Court to do for you.

_____

**\*  PLEASE SEE ATTACHED COMPLAINT AND RELIEF REQUESTED**

_____

_____

I declare under penalty of perjury that the foregoing is true and correct.

_____            _____
(Date)                                    (Your Signature)

*Prisoner Civil Rights Complaint – Page #4*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MONICA ELAINE WADE,

Plaintiff

COMPLAINT

V.

Indiria Sawhney, Verma Umesh
Olivia Bruce, Tonya Watson,
Yolanda Sharfner-Butchee,
V. Parker, in their individual
capacities

JURY TRIAL DEMANDED

Defendants,

---

## Preliminary Statement

This is a civil rights action filed by Monica Elaine Wade, a state prisoner, for damages and injunctive relief under 42 U.S.C. §1983, alleging denial of medical care and indifference to serious medical needs in violation of the Eighth Amendment to the United States Constitution and denial of equal protection of the law in violation of the Fourteenth Amendment to the Constitution. The plaintiff also alleges the torts of medical malpractice and negligence.

## Exhaustion

Plaintiff has exhausted the available state remedies, that being the prisoner grievance process. Plaintiff filed at Step I, and appealed at Steps II and III. The Step I grievances, Step II grievance appeals and available responses regarding the claims in this action are attached, in the Exhibit(s) section of this complaint.

## Jurisdiction

1. The court has jurisdiction over the plaintiff's claims of violation of federal constitutional rights under 28 U.S.C. § 1331(a) and 1343.

2. The court has supplemental jurisdiction over the plaintiff's state law tort claims under 28 U.S.C. §1367

**Parties**

3. Plaintiff was incarcerated at the Robert Scott Correctional Facility at 47500 Five Mile Road in Plymouth, Michigan, 48170 during the events described in this complaint.

4. Defendant Indiria Sawhney was employed as the medical doctor at the Robert Scott Correctional Facility during the events described in this complaint and was responsible for providing medical care for prisoners in that facility. She is sued in her individual capacity.

5. Defendant Verma Umesh is a medical doctor who was employed at the Duane L. Waters Hospital at the Charles E. Egeler Correctional Facility during the events described in this complaint and was responsible for drafting consultation reports and making referrals for specialist services. He is sued in his individual capacity.

6. Defendant Olivia Bruce was the Assistant Deputy Warden for Housing at the Robert Scott Correctional Facility during the events described in this complaint and was responsible for prisoner placement and transfers. She is sued in her individual capacity.

7. Defendant Tonya Watson is the Resident Unit Manager (RUM) at the Robert Scott Correctional Facility and was responsible for managing the Assistant Resident Unit Supervisors (ARUS's) and corrections officers and prisoners within the Essex housing unit during the events described in this complaint. She is sued in her individual capacity.

8. Defendant V. Parker is the Assistant Resident Unit Supervisor (ARUS) at the Robert Scott Correctional Facility and was responsible for the direct supervision of corrections officers and prisoners within the Essex housing unit during the events described in this complaint. She is sued in her individual capacity.

9. Defendant Yolanda Sharfner-Butchee is a correctioal officer employed at the Robert Scott Corrections Facility. She is sued in her individual capacity.

10. All the defendant have acted, and continue to act, under color of state law at all times relevant to this complaint.


STATEMENT OF FACTS

Denial of Medical Care

11. Defendant Indiria Sawhney owed Plaintiff the duty to provide a continuum of reasonably adequate medical care; to monitor plaintiff's chronic condition – High Blood Pressure; to prescribe adequate and effective medications to control plaintiff's high blood pressure; to provide after care information; to order assistance with every day activities and basic human needs; to provide auxiliary aides; to provide access to necessary medical equipment; to follow the orders of the outside specialist; to provide access to outside specialist services once ordered, and to deliver medical services in a humane manner without subjecting plaintiff to undue mental anguish, emotional distress and humiliation.

12. Defendant breached that duty by ordering the confiscation of plaintiff's blood pressure control medication and then discontinuing it; by failing to monitor plaintiff's blood pressure for a reasonable length of time after discontinuing the medication; by refusing to prescribe any medication to control plaintiff's blood pressure; by failing to order a prisoner aide to assist plaintiff with basic human needs after plaintiff suffered a stroke; by refusing to provide plaintiff an orthopedic ankle brace after it was ordered by Doctor Kraussman who diagnosed and treated Plaintiff for the stroke; by failing to provide plaintiff access to outside specialist services after physical therapy was recommended by Dr. Umesh during a consultation visit with plaintiff; by denying plaintiff access to her wheelchair; by confiscating plaintiff's wheelchair and by humiliating and frightening plaintiff during office visits.

13. On April 18, 2003 Defendant Sawhney called plaintiff to the health care unit and took her blood pressure and it registered 130/80.

14. Defendant informed plaintiff that she was discontinuing plaintiff's medication, MAXIDE, stating, "You're good, you don't need medicine anymore."

15. Plaintiff objected and told defendant that without medication her blood pressure would rise to dangerous levels.

16. Defendant told plaintiff that she would monitor plaintiff's blood pressure for two weeks and see if it rose and then sent plaintiff back to her housing unit.

17. Shortly after plaintiff returned to her housing unit on April 18, 2003, Officer Chives told plaintiff that defendant had called and wanted plaintiff to return to the health care unit and to bring her medication with her.

18. When plaintiff returned to the health care unit, Nurse Rawlins confiscated her Maxide and gave plaintiff a temporary detail to go to the health care unit every other day for two (2) weeks to have her blood pressure taken.

19. Plaintiff was without any blood pressure control medication during the two (2) weeks that her blood pressure was being monitored.

20. On May 5, 2003 plaintiff went to the health care unit where defendant took her blood pressure and it registered 142/97.

21. Plaintiff pointed out to defendant the fact that her pressure had risen since April 18, 2003 when defendant had her medication confiscated and warned defendant that her pressure would continue to rise without medication.

22. Defendant informed plaintiff that she was discontinuing her blood pressure control medication stating, "It's a good pressure, you don't need medication."

23. Defendant disregarded the fact the plaintiff's blood pressure had risen since April 18, 2003 when she had plaintiff's medication confiscated.

24. Defendant disregarded plaintiff's warning that her blood pressure would rise without medication and on May 5, 2003 discontinued Plaintiff's chronic care treatment by not returning Plaintiff's Maxide, and by refusing to prescribe more Maxide, or any other medication(s) to control plaintiff's high blood pressure.

25. Defendant failed to monitor Plaintiff's blood pressure for three (3) months subsequent to discontinuing her blood pressure medication.

26. On May 5, 2003 defendant had knowledge that plaintiff had been identified on the **HEALTH MANAGEMENT INFORMATION SYSTEM** and had been enrolled in the **CHRONIC CARE CLINIC** for nine (9) years preceding defendant confiscating and discontinuing her medication.

27. On May 5, 2003 defendant had knowledge that plaintiff had been being prescribed **MAXIDE** to control her high blood pressure for the preceding nine (9) years prior to defendant discontinuing plaintiff's medication.

28. Defendant knew, or should have known that plaintiff would suffer adverse consequences to her health by abruptly discontinuing her Maxide and not prescribing any other medication to control plaintiff's blood pressure.

29. The breach of duty resulted in damages.

30. Defendant's abrupt discontinuation of plaintiff's Maxide caused plaintiff's blood pressure to escalate.

31. Plaintiff's escalating blood pressure went undetected by defendant for three (3) months after defendant discontinued plaintiff's Maxide.

32. On July 25, 2003 plaintiff awoke at approximately 6:30 a.m. with a severe headache and numbness on the left side of her body.

33. Plaintiff was immediately taken by wheelchair to the health care unit by Sgt. Heiple where she was given a cursory examination by Dr. Singhal and her blood pressure was taken by Nurse Davis and registered 190/120.

34. Plaintiff was transported by ambulance to St. Mary's Mercy hospital where she was admitted and subsequently diagnosed by Dr. Kraussman as having suffered a **CEREBRAL VASCULAR ACCIENT** (stroke).

35. Plaintiff's escalate blood pressure caused her to have a stroke.

36. Plaintiff's untreated Hypertension caused the escalation of her blood pressure.

37. The stroke damaged plaintiff's left leg, ankle, and arm and plaintiff is disabled as a result of the stroke.

38. For the nine (9) years preceding April 18, 2003 when defendant discontinued plaintiff's medication, plaintiff took only one (1) Maxide pill per day to control her blood pressure.

39. Since suffering the stroke, plaintiff now has to take six (6) different kinds of medication in order to control her blood pressure.

40. The breach of duty proximately caused those damages.

41. On July 28, 2003, the day after plaintiff was released form St. Mary's hospital, she was escorted to the health care unit by Officer Ralph-Smith to meet with defendant where defendant asked plaintiff, "What do you think happened to you?"

42. Plaintiff answered, "You took my medicine and I had a stroke."

43. Defendant began yelling at Plaintiff, "You are a liar, I didn't take your medicine!"

44. Defendant then told Plaintiff to lay on the examination table where she then lifted Plaintiff's partially paralyzed left leg into the air and ordered Plaintiff to hold her leg suspended in the air.

45. When Plaintiff could not hold her partially paralyzed leg in the air, Defendant began yelling at Plaintiff in a foreign language.

46. Defendant then yelled into Plaintiff's face in English, "You're faking!" and then left the examination room without providing Plaintiff aftercare instructions on eating, dressing, bathing and exercise.

47. On August 9, 2003 Plaintiff received, via the mail, a SPECIAL ACCOMODATIONS NOTICE, completed by Defendant and approved by Deputy Warden Susan Davis, ordering for Plaintiff a wheelchair, a shower chair, a bottom bunk, and access to an elevator.

48. Defendant failed to order an ankle brace, extra bedding, or a prisoner aide to assist Plaintiff with meals, dressing, help to and from the shower, cleaning her cell and transportation within the facility.

49. Plaintiff lost between ten (10) and fifteen (15) pounds because she could not chew food for two (2) weeks after suffering a stroke.

50. Plaintiff had difficulty reaching the toilet and mobility without an ankle brace.

51. Plaintiff had difficulty getting to and from the shower, dressing, cleaning her cell and transportation within the facility without a prisoner aide.

52. Plaintiff suffered humiliation and mental distress by soiling herself and her bed by not being able to reach the toilet in time to relieve herself.

53. Plaintiff had to forego outside recreation, meals, call-outs and medication on several occasions because she did not have an aide to transport her to the yard, chow hall, or health care unit.

54. Plaintiff suffered emotional distress, depression and sadness all the time by not having anyone to aide her with meals, getting to and from the shower, cleaning her cell and transportation within the facility.

55. Plaintiff suffered humiliation, emotional distress and fear when Defendant verbally abused her on July 28, 2003 because she could not hold her partially paralyzed leg suspended in the air upon Defendant's command.

56. The breach of duty proximately caused those damages.

57. On August 18, 2003 Plaintiff went to the health care unit to meet with Defendant.

58. Plaintiff told defendant that the SPECIAL ACCOMMODATIONS NOTICE she'd received on August 9, 2003 did not include orders for an ankle brace, physical therapy, or a prisoner aide.

59.   Plaintiff told defendant that she was experiencing muscle spasms and asked defendant if she shouldn't have a Potassium supplement to accompany the Hydrodiuril (diuretic) defendant was prescribing her.

60.   Defendant disregarded Plaintiff's inquiries regarding the ankle brace and physical therapy and proceeded to check Plaintiff's medical file for Plaintiff's last lab report regarding Potassium.

61.   Plaintiff interrupted and told defendant that the lab report she was looking at was done before Plaintiff's stroke and before Plaintiff had began taking Hydrodiuril.

62.   Defendant became belligerent and began yelling at Plaintiff, "You don't tell me how to practice my medicine!"

63.   Defendant then got up, grabbed Plaintiff's wheelchair by its handles and pushed the chair out into the hallway.

64.   Defendant went down the hallway toward her office and did not return, leaving Plaintiff in the examination room alone.

65.   Plaintiff yelled, "Help" for someone to come and bring the wheelchair to her so that she could get into it and leave the examination room.

66.   Plaintiff suffered anxiety, emotional distress and fear when Defendant left her in the examination room alone and she could not reach her wheelchair after defendant had pushed it into the hallway out of Plaintiff's reach.

67.   The breach of duty proximately caused those damages.

68.   On September 26, 2003 Plaintiff went to the health care unit to meet with Defendant.

69.   Plaintiff asked Defendant about physical therapy and an ankle brace to which defendant stated, "The CMS neurologist office has closed so we have to wait until they find new offices before you can see him."

70.   To Plaintiff's inquiry about the ankle brace, Defendant insisted that Plaintiff already possessed an ankle brace from the hopsital.

71.   Plaintiff told Defendant that she did not have an ankle brace from the hospital, only a support hose that she was given by Nurse Howell on September 6, 2003.

72.   Defendant told Plaintiff that she would order an ankle brace for her.

73.   Plaintiff again told defendant that she was experiencing muscle spasms to which defendant answered, "If your leg is paralyzed, you shouldn't have any feeling in it."

74.   Defendant gave Plaintiff regular strength Tylenol for her muscle spasms and then sent Plaintiff back to her housing unit.

75.   On December 22, 2003 Plaintiff was sent out to the Duane Waters Hospital at the Charles Egeler Facility for a specialist consultation visit with Dr. Verma Umesh.

76.   On December 23, 2003 Defendant called Plaintiff to the health care unit where defendant asked Plaintiff how she was doing and what the Neurologist had said to her.

77.   Plaintiff told Defendant that the Neurologist said he would recommend physical therapy and then see her in about six (6) months to see how she responded to therapy.

78.   Plaintiff told Defendant that she had been experiencing heart palpatations for the past week and that she'd had an on-going headache for about two (2) days.

79.   Defendant took Plaintiff's blood pressure and it registered 168/97.

80.   Plaintiff expressed concern about her blood pressure being so high and asked Defendant how that could be when she was already being prescribed, and taking, several types of blood pressure medications.

81.   Defendant responded by telling Plaintiff of a notation in her medical file from the then dietician, Ms. Sanders, stating that Plaintiff had told her that she eats food from the prison store.

82.   Defendant stated, "You have to stop eating so much raw salt."

83.   Plaintiff denied eating raw salt, or that she'd told Ms. Sanders so.

84.   Defendant responded by getting up and walking out of the examination room and leaving Plaintiff alone.

85.   On February 9, 2004 Defendant called Plaintiff to the health care unit to meet with her.

86.   Defendant told Plaintiff that she had received the consultation report from the neurologist and that he had reported that Plaintiff was faking and that he had not recommended physical therapy.

87.   Defendant told Plaintiff that as a consequence of the neurology report, she was confiscating Plaintiff's wheelchair.

88.   Plaintiff asked to see the neurology report and the name of the neurologist.

89.   Defendant refused to show Plaintiff the neurology report and stated, "You saw him, didn't he tell you his name?"

90.   Plaintiff told Defendant that since the stroke, she could not always remember things.

91.   Plaintiff told defendant that she could not get back to her unit without the wheelchair.

92.   Defendant told Plaintiff that she could have a cane.

93.   Plaintiff told Defendant that she was not strong enough to walk all the way back to her unit with the cane.

94. Defendant responded by leaving the examination room and taking Plaintiff's wheelchair with her.

95. A short time later, Nurse Rawlins entered the examination room with a four-pronged cane and gave it to Plaintiff.

96. Plaintiff submitted a request to the medical records department for a copy of the neurology report from her consultation visit on December 22, 2003.

97. Plaintiff received the neurology report on April 19, 2004 which, on page 3 of 3 did recommend physical therapy for Plaintiff for six (6) months.

98. Plaintiff filed a formal grievance about defendant lying to her about the neurologists recommendation.

99. Defendant had knowledge that the neurologists report had recommended physical therapy for Plaintiff for six (6) months.

100. Defendant owed Plaintiff the duty to follow the orders of the outside specialist and order outsided specialist services for Plaintiff in accordance with the neurologists recommendation.

101. Defendant breached that duty on February 9, 2004 when she lied to Plaintiff about the contents of the neurology report and subsequently failed to order physical therapy for Plaintiff.

102. Defendant knew of the wintry conditions of February 9, 2004 and that there was a risk of harm to Plaintiff by walking in those wintry conditions with a four-pronged cane.

103. Defendant knew the distance from the health care unit to Plaintiff's housing unit and that Plaintiff was not stable enough to walk the distance on a four-pronged cane in wintry conditions.

104. Defendant had knowledge that Plaintiff's left foot dragged and she could not lift her left foot to make a step.

105. Defendant had a duty to protect Plaintiff from impeding harm to her safety and to provide Plaintiff necessary equipment for her medical condition.

106. Defendant breached that duty when she took Plaintiff's wheelchair and caused her to have to walk a considerable distance with a cane in inclimate weather.

107. The breach of duty resulted in damages.

108. Plaintiff suffered fear of falling on icy, snow-covered ground when she was forced to walk from the health care unit with a cane after defendant confiscated her wheelchair.

109. Defendant had knowledge that an orthopedic ankle brace had been ordered for Plaintiff by the St. Mary's hospital doctor, Kraussman, who treated Plaintiff after she suffered a stroke.

110. Defendant refused to order, or provide Plaintiff an orthopedic ankle brace.

111. The breach of duty resulted in damages.

112. Plaintiff suffers from muscle spasms, discomfort and periodic pain in her left leg and ankle.

113. Plaintiff suffers undue hardships and limited mobility by not being able to walk unassisted, or without an ankle brace.

114. Plaintiff suffers mental and emotional distress anguish, from defendant allowing her to believe she would receive physical therapy and an ankle brace, but then not ordering them.

115. Plaintiff suffers mental anguish and undue hardships by not receiving adequate medical and after care which would aide her in recovering the use of her leg and ankle.

116. Plaintiff suffers anxiety and fear whenever she is called out to meet with Defendant.

117. The breach of duty proximately caused those damages.

**Reckless Disregard to Health and Safety**

118. Defendant V. Parker owed Plaintiff the duty to provide reasonable safety from harmful conditions that posed a risk of serious damage to Plaintiff's future health, and to provide Plaintiff with the minimal of life's basic necessities.

119. Defendant breached that duty when she refused to allow any other prisoners to assist Plaintiff to and from the shower, and with cleaning her cell and with transportation within the facility.

120. On August 8, 2003 Plaintiff had a call-out to the health care unit.

121. Prisoner Victoria Murphy volunteered to escort Plaintiff to the health care unit.

122. Prisoner Murphy got permission from Officer E. Brown to escort Plaintiff to the health care unit.

123. Plaintiff and Prisoner Murphy went to the officer's station to receive passes to go to the health care unit.

124. While Plaintiff and Prisoner Murphy were waiting for passes, Defendant knocked on her office window and summoned for Officer Brown to come into her office.

125. When officer Brown returned to the officers desk, he stated to Prisoner Murphy, "I can't give you a pass to help Wade cause Ms. Parker says Wade is faking and don't need no assistance."

126. Officer Brown then gave Plaintiff a pass to the health care unit and Plaintiff went alone.

127. Defendant had knowledge that Plaintiff went to the health care unit unescorted on August 8, 2003.

128. Defendant had knowledge that Plaintiff had been admitted to St. Mary's hospital on July 25, 2003 and diagnosed as having had a stroke.

129. Defendant had knowledge that Plaintiff had only bee released from the hospital for eleven (11) days on August 8, 2003.

130. Defendant observed plaintiff using a four-pronged cane to aid her in walking.

131. Defendant had knowledge that plaintiff was disabled.

132. Defendant failed to act reasonably in response to her knowledge of the risk of harm plaintiff faced by walking to the health care  unit unescorted.

133. Defendant failed to act to protect plaintiff from harm that was easily preventable.

134. Defendant disregarded the substantial risk to plaintiff's health and safety by allowing her to walk to the health care unit unescorted.

135. The breach of duty resulted in damages.

136. Plaintiff lost her balance and fell.

137. Plaintiff's left hand fingers banged, or scraped the ground and chunks of meat came out of plaintiff's fingers.

138. Plaintiff suffered humiliation and emotional distress when she had to sit on the ground until Officers Rhodes-Reeves, Chives and E. Brown came to help her up and into a wheelchair.

139. The breach of duty proximately caused those damages.

**Deliberate Indifference to Serious Medical Needs**

140. Defendant Sharfner-Butchee owed plaintiff the duty to provide humane treatment, freedom from discrimination and to follow the orders of Qualified Medical Professionals.

141. Defendant breached that duty when she failed to follow the medical doctor's order for plaintiff to have a wheelchair by repeatedly taking plaintiff's assigned wheelchair and not returning it to her.

142. Defendant took plaintiff's wheelchair from her on August 30, 2003 and on September 3, 2003 and did not return it for several hours.

143. Defendant took plaintiff's wheelchair from her on September 9, 2003 and did not return it at all.

144. Defendant had knowledge that plaintiff possessed a **SPECIAL ACCOMMODATIONS NOTICE** signed by Dr. Sawhney and approved by the Deputy Warden, Susan Davis, assigning the wheelchair to plaintiff.

146. Defendant showed deliberate indifference to plaintiff's serious medical needs by repeatedly denying plaintiff access to her assigned wheelchair.

147. The breach of duty resulted in damages.

148. Plaintiff could not go to the yard for recreation, to the chow hall for meals, or attend religious services and call-outs for several days.

149. Plaintiff receive food only twice in the first five (5) days after defendant took her wheelchair, between September 9, 2003 and September 21, 2003.

150. On September 14, 2003 Plaintiff suffered humiliation and mental anguish when she had to scoot on her buttocks in an attempt to go to her law library call-out.

151. Plaintiff suffered emotional distress, mental anguish and hunger by Defendant denying her access to her assigned wheelchair.

152. The breach of duty proximately caused those damages.

**Inadequate Examination**

153. Defendant Verma Umesh owed Plaintiff the duty to perform an examination consistent with Plaintiff's symptoms, to accurately assess Plaintiff's medical needs based on his observations and to recommend adequate treatment(s) for Plaintiff's condition.

154. Defendant breached that duty on December 22, 2003 when he failed to inquire into essential facts necessary to make a professional judgment about Plaintiff's condition.

155. Defendant failed to conduct an extensive and adequate examination and perform tests that Plaintiff's symptoms called for.

156. Defendant made a report and recommendation for Plaintiff's treatment based on the observations and examinations performed by Dr. Kraussman of St. Mary's hospital on July 25, 26 and 27, 2003.

157. Defendant showed deliberate indifference to Plaintiff's serious medical needs when he had at least two (2) conversations on his cell phone during the time he was examining Plaintiff.

158. Defendant's inadequate examination failed to detect the loss of muscle tone in Plaintiff's left thigh.

159. Defendant's inadequate examination and ensuing report set into motion the denial of equal protection of the law by the Robert Scott Correctional Facility doctor, Defendant Sawhney.

160. The breach of duty resulted in damages.

161. Plaintiff's wheelchair needed for transportation within the facility was rescinded by Defendant Sawhney as a result of Defendant's consultation report.

162. Plaintiff was denied physical therapy and an ankle brace by Defendant Sawhney as a result of Defendant's inadequate examination and ensuing consultation report.

163. Plaintiff has not recovered the full use of her left leg and foot as a result of being denied physical therapy.

164. Plaintiff's mobility is limited as a result of the denial of physical therapy and an ankle brace.

165. Plaintiff can not walk without the assistance of a cane.

166. Plaintiff suffers from muscle spasms and periodic pain in her left leg and ankle.

167. The breach of duty proximately caused those damages.

## Cruel and Unusual Punishment and Denial of Equal Protection of the Law

168. Defendants Olivia Bruce and Tonya Watson owed Plaintiff the duty to provide access to adequate facilities and equipment to accommodate her handicap and to follow the orders of the Qualified Medical Professionals for Plaintiff's medical care.

169. Defendants breached that duty when they failed to provide Plaintiff elevator access after it was ordered by the Scott correctional Facility doctor, Sawhney, and approved by Assistant Deputy Warden, then "Acting Deputy Warden," Robin Cole.

170. Defendants breached that duty when they delayed having handicapped shower railings installed in the Essex housing unit shower facilities for six (6) weeks after Plaintiff was assigned to Essex housing unit.

171. Defendants breached that duty when they failed to provide Plaintiff access to a shower chair after it was ordered by the Robert Scott Correctional Facility doctor and approved by Susan Davis, the Deputy Warden.

172. On March 19, 2004 Defendant Bruce signed an ordered to place Plaintiff in Essex A housing unit upon Plaintiff's release from the segregation unit.

173. Essex A unit was not equipped with handicapped provisions.

174. On March 19, 2004 Plaintiff had to walk with the assistance of a walker.

175. Plaintiff wrote to Defendant Bruce on March 23, 2004 and requested elevator access and that shower railing be installed in the Essex A housing unit.

176. Defendant Bruce did not respond to Plaintiff's written request.

177. Plaintiff told the unit officers, Dobbins and Rhodes-Reeves that she could not shower without shower railings or a shower chair and that she needed elevator access to go to call-outs, meals, religious services, yard and to reach the telephones.

178. Plaintiff told Defendant Watson that she could not shower without shower railings or a shower chair and that she needed elevator access in order to go to call-outs, meals, religious services, yard and to reach the telephones.

179. Defendant Watson responded by ordering the unit Officers, Dobbins and Rhodes-Reeves to have meals taken to plaintiff's cell.

180. Plaintiff had to sit on her buttocks and scoot up and down the stairs to attend call-outs.

181. Defendant Watson's office is situated where she has a clear view of the entire Essex A unit.

182. Defendant Watson observed plaintiff scoot up an down the stairs on her buttocks, or go with her cane on several occasions between March 19, 2004 and June 30, 2004.

183. Defendant Watson delayed having handicap shower railings installed, or a shower chair brought to plaintiff for six (6) weeks after plaintiff was placed in Essex A unit and had notified her that she could not shower without these provisions.

184. On March 19, 2004 and since August 5, 2003 defendant Bruce has had knowledge that Plaintiff is disabled and could not use stairs.

185. On March 19, 2004 and since July 31, 2003 defendant Watson has had knowledge that plaintiff is disabled and can not use stairs.

186. From March 23, 2004 until June 30, 2004 defendants Bruce and Watson had knowledge that plaintiff possessed a **SPECIAL ACCOMMODATIONS NOTICE** signed by the Robert Scott Correctional Facility doctor and approved the Assistant Deputy Warden, then "Acting Deputy Warden," Robin Cole, ordering "elevator use only" for Plaintiff.

187. From March 23, 2004 until June 30, 2004 defendants Bruce and Watson had knowledge that plaintiff possessed a **SPECIAL ACCOMMODATIONS NOTICE** signed by defendant Sawhney and approved by Deputy Warden Susan Davis ordering a shower chair for plaintiff.

188. Defendants Bruce and Watson failed to act to provide plaintiff elevator access after plaintiff had filed a formal grievance and made written and verbal requests for elevator access.

189. Defendants Bruce and Watson failed to follow the orders of the Robert Scott Facility doctor, Sawhney, to provide plaintiff elevator access.

190. Defendants Bruce and Watson had the power to remedy the conditions that they knew violated plaintiff's constitutional rights.

191. Defendant Watson showed deliberate to plaintiff's obvious need for an elevator when she observed plaintiff on several occasions from March 19, 2004 until June 30, 2004 scoot up and down the stairs on her buttocks, or go with a cane.

192. Defendants Bruce and Watson showed deliberate indifference to plaintiff's safety and future health by denying plaintiff access to an elevator, or by delaying having shower railings installed for six (6) weeks.

193. The breach of duty resulted in damages.

194. On June 23, 2004 plaintiff suffered physical injury when she fell down the Essex A unit stairs.

195. Plaintiff banged her head on the cement floor and a lump arose on her head.

196. Officer Rhodes-Reeves and Prisoner Anna Jones helped plaintiff off of the floor and into a wheelchair.

197. Plaintiff's left side forehead and left eye did swell and turn black.

198. Plaintiff's right shin did swell and bruise from the fall.

199. Prisoner Anna Jones wheeled plaintiff to the health care unit where she was treated by Nurse Droust for swelling and bruises to her forehead, left eye and right leg.

200. Plaintiff's eye was black for three (3) weeks.

201. The swelling and bruising in plaintiff's right shin persists to date.

202. Plaintiff suffered humiliation and mental anguish when she could not take a shower for six (6) weeks.

203. Plaintiff wand felt alienated when she had to eat meals in her cell and could not have recreation with other prisoners for three (3) months because she could not get to the base area, or to the yard.

204. Plaintiff suffered humiliation and mental anguish by having to sit on her buttocks and slide or scoot up and down the stairs in order to attend doctors appointments, visits and law library call-outs.

205. Plaintiff suffered muscle spasms in her left leg because she could not go to the yard for exercise for three (3) months.

206. The breach of duty proximately caused those damages.

## Claims for Relief

207. The actions of Defendant Sawhney in having plaintiff's blood pressure control medicine confiscated and in discontinuing plaintiff's chronic care treatment by refusing to prescribe any medication(s) to control plaintiff's high blood pressure and by failing to monitor plaintiff's blood pressure for a reasonable length of time after discontinuing her medication denied plaintiff adequate medical care and constitutes deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment to the United States Constitution.

208. The actions of Defendant Sawhney in having plaintiff's blood pressure control medicine confiscated and in discontinuing plaintiff's chronic care treatment by refusing to prescribe any medication(s) to control plaintiff's high blood pressure and by failing to monitor plaintiff's blood pressure for a reasonable length of time after discontinuing her medication constitutes the tort of medical malpractice under the law of M.C.L. 600.2912(1).

**209.** The actions of Defendant Sawhney in having plintiff's blood pressure control medicine confiscated and in discontinuing plaintiff's chronic care treatment by refusing to prescribe any medication(s) to control plaintiff's high blood pressure and by failing to monitor plaintiff's blood pressure for a reasonable length of time after discontinuing her medication constitutes the tort of gross negligence under the law of M.C.L. 600.2912(1)

**210.** The failure of Defendant Sawhney to provide plaintiff after care instructions; to follow the recommendation of the outside specialist for physical therapy to restore the use of Plaintiff's leg and ankle; to provide a prosthetic device for Plaintiff's ankle after it was ordered by the St. Mary's hospital doctor, Kraussman, and to order a prisoner aide to assist plaintiff with meals, transportation within the facility and help to and from the shower deprived Plaintiff of the minimal civilized measure of life's necessities and constitutes deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment to the United States Constitution.

**211.** The failure of Defendant Sawhney to provide plaintiff after care instructions; to follow the recommendation of the outside specialist for physical therapy to restore the use of plaintiff's leg and ankle; to provide a prosthetic device for plaintiff's ankle after it was ordered by the St. Mary's hospital doctor, Kraussman, and to order a prisoner aide to assist plaintiff with meals, transportation within the facility and help to and from the shower deprived plaintiff of the minimal civilized measure of life's necessities and constitutes the tort of negligence under the law of M.C.L. 600.2912(1)

**212.** The actions of Defendant Sawhney in humiliating and verbally abusing plaintiff during office visits on July 28, 2003 by yelling into plaintiff's face "you are faking!" and by ordering plaintiff to hold her partially paralyzed leg suspended in the air; and on August 18, 2003 by pushing plaintiff's wheelchair out of plaintiff's reach and leaving plaintiff alone in the examination room; and on February 9, 2004 by lying to plaintiff about the neurologists consultation report of 12-22-03 and then confiscating plaintiff's wheelchair and expecting her to walk back to her housing unit during inclimate weather conditions subjected plaintiff to mental and emotional distress and constitutes the wanton infliction of pain and suffering in violation of the Eighth Amendment to the United States Constitution.

**213.** The failure of Defendant Umesh to perform an adequate examination and conduct tests consistent with plaintiff's symptoms constitutes deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment to the United States Constitution and contributed to and proximately caused the violation of Eighth Amendment rights and the torts of negligence described in paragraphs 85-95, 102-108 and 111 - 117

**214.** The failure of Defendant Umesh to perform an adequate examination and conduct tests consistent with plaintiff's symptoms constitutes the tort of negligence under the law of M.C.L. 600.2912(1) and 600.2912a(b).

**215.** The actions of Defendants Bruce and Watson in assigning plaintiff to a unit absent an elevator, handicap shower railings, or a shower chair after defendants had been placed on notice that plaintiff was disabled and that the facility doctor

had issued an order for plaintiff to have elevator access and not to use stairs, or in failing to remedy the conditions that they knew violated plaintiff's constitutional rights constitutes deliberate indifference to plaintiff's serious medical needs and cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

216. The actions of Defendants Bruce and Watson in assigning plaintiff to a unit absent an elevator, handicap shower railings, or a shower chair after defendants had been placed on notice that plaintiff was disabled and that the facility doctor had issued an order for plaintiff to have elevator access and not to use stairs, or in failing to rememdy the conditions that they knew violated plaintiff's constitutional rights constitutes deliberate indifference to plaintiff's safety and further denied plaintiff equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution and contributed to and proximately caused plaintiff's injuries described in paragraphs 193-206 in violation of the Constitution.

217. The actions of Defendants Bruce and Watson in assigning plaintiff to a unit absent an elevator, handicap shower railings, or a shower chair after defendants had been placed on notice that plaintiff was disabled, or in failing to remedy the conditions that they knew, or should have known posed a serious risk to plaintiff's health and safety contsitutes the tort of negligence under the law of M.C.L 600.5501 M.C.L. 691.1401(c),(d) and (f) and P.A. 1964

218. The actions of Defendant Parker in ordering Officer E. Brown not to allow Prisoner Murphy to assist/escort plaintiff to the health care unit eleven (11) days after plaintiff had a stroke that left her disabled constitutes deliberate indifference to the substantial risk of harm for plaintiff in violation of the Eighth Amendment to the United States Constitution and contributed to and proximately caused the injuries plaintiff sustained described in paragraphs 135-139.

219. The actions of Defendant Parker in ordering Officer E. Brown not to allow Prisoner Murphy assist/escort plaintiff to the health care unit eleven (11) days after plaintiff suffered a stroke that left her disabled constitutes deliberate indifference to a substantial risk to plaintiff's health and safety under the tort law of M.C.L. 691.1401(c),(d) and (f) and P.A. 1964 and M.C.L 600.5501.

220. The actions of Defendant Sharfner-Butchee in repeatedly taking Plaintiff's wheelchair and failing to return it leaving plaintiff unable to attend call-outs, yard for recreation, or go to the chow hall for meals after being put on notice that plaintiff was disabled and that the wheelchair was ordered and assigned to plaintiff by the facility's doctor constitutes deliberate indifference, failure to adhere to prescribed treatment and discrimination in violation of the Eighth Amendment to the United States Constitution and further denied plaintiff equal protection of the law in violation of the Fourteenth Amendment to the Constitution.

Relief Requested

WHEREFORE, plaintiff requests:

A. Issue an injunction ordering defendant Sawhney, or her agents to:

1. Immediately arrange for the plaintiff's need for physical therapy.

2. Immediately provide an orthopedic ankle brace for plaintiff;

3. Carry out without delay the treatment directed by Dr.'s Kraussman and Umesh.

**B.** Award compensatory damages against:

1. Defendant Sawhney for the stroke and emotional injury plaintiff suffered resulting from defendant's failure to provide adequate medical care, physical therapy, auxiliary aides, and after care information.

2. Defendant Umesh for the emotional injury and denial of adequate medical care resulting from his failure to perform adequate tests and an examination consistent with plaintiffs symptoms.

3. Defendants Bruce and Watson for the cruel and unusual punishment and physical and emotional injuries resulting from their denial of equal protection of the law by assigning plaintiff to a housing unit absent handicap accommodations and in failing to remedy the conditions that they knew violated plaintiff's constitutional rights.

4. Defendant Parker for her deliberate indifference to plaintiff's health and safety that resulted in physical and emotional injuries to plaintiff.

5. Defendant Sharfner-Butchee for the deprivation of food and mobility and emotional injuries plaintiff suffered as a result of defendants failure to follow doctors orders and discrimination in repeatedly denying plaintiff access to her assigned wheelchair.

**C.** Award punitive damages against defendants Sawhney, Umesh, Bruce, Watson, Parker and Sharfner-Butchee.

Signed this 3RD day of FEBRUARY, 2005

Subscribed and sworn before me, this 3RD day of FEBRUARY 2005, a Notary Public in and for WAYNE County,

_Gayle Spearman Leach_

NOTARY PUBLIC
My Commission expires Jan 30, 2007.

GAYLE SPEARMAN LEACH
NOTARY PUBLIC WAYNE CO., MI
MY COMMISSION EXPIRES Jan 30, 2007

_____
Signature of Plaintiff

I declare under penalty of perjury that the foregoing is true an correct.

February 3, 2005
Date

_____
Signature

# SUMMONS

2 per each defendant

\* See Judge's Copy
Please

# MOTION

## Preliminary Injunction
## Temporary Restraining Order

* Declaration in support

* Memorandum of Law

* Order To Show Cause

* Affidavit In Support

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MONICA  ELAINE WADE,

                    Plaintiff,


v


Indiria Sawhney, Verma Umesh,
Olivia Bruce, Tonya Watson,
Yolanda Sharfner-Butchee,
V. Parker, in their individual
capacities.

                    Defendants,

---

### PLAINTIFF'S MOTION REQUESTING A PRELIMINARY INJUNCTION
### AND TEMPORARY RESTRAINING ORDER UNDER FED.R.CIV.P. 65(b)


      Plaintiff, in pro se, moves this court to enter its order compelling Defendant
Sawhney, her successors in office, agents and employees and all other persons
acting in concern and participation with her to provide a medically appropriate
course of physical therapy and an orthopedic ankle brace to the plaintiff designed
to restore and maintain the full function of her left leg and ankle.  Plaintiff
asks this Honorable court to grant plaintiff's motion based on the grounds set
forth in the accompanying affidavit and memorandum of law.

Fed.R.Civ.P. 65(a).

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MONICA  ELAINE WADE,

                    Plaintiff,


v


Indiria Sawhney, Verma Umesh,
Olivia Bruce, Tonya Watson,
Yolanda Sharfner-Butchee,
V. Parker, in their individual
capacities.

                    Defendants,

---

### DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR A
### TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

MONICA ELAINE WADE declares under penalty of perjury:

1.  I am the plaintiff in this case.  I make this declaration in support of my motion for a temporary restraining order and apreliminary injunction to ensure that I receive necessary medical care.

2.  As set forth in the Complaint in this case, I was denied blood pressure medication from April 18, 2003 until July 25, 2003.

3.  On July 25, 2003 I awoke with a severe headache and numbness on the left side of my body.

4.  I was taken to the emergency room of St. Mary's Mercy Hospital where I was admitted and treated by Dr. Kraussman, told me that I had suffered a Cerebral Vascular Accident (stroke).

5.  Dr. Kraussman wrote my diagnosis and the directions concerning appropriate blood pressure control medications and after care which included physical therapy, an ankle brace and specific blood work. I was given a copy of the forms and released from St. Mary's Mercy hospital and I was returned to the prison by escort officers Green, Page and Goosiak.

6.  Exhibit 1 attached to this affidavit is the "Continuing Patient Care" and "Diagnosis" Forms from St. Mary's hospital.

7. Contrary to Dr. Kraussman's direction, I was not provided an orthopedic ankle brace, or physical therapy despite my repeated requests and filing of formal grievances.

8. On information and belief, I have not been provided with physical therapy because Defendant Sawhney lied to the Corrections Medical Services Department about the contents of my specialist consultation report of December 22, 2003, and because the MDOC is under strict budget cuts.

9. Physical therapy services are not provided in prison at the Robert Scott facility; prisoners needing such services must be taken to the Duane L. Waters facility.

10. I experience periodic muscle spasms in my left leg which is painful and my left ankle lacks muscle tone and I can not lift my foot to make a step. My left ankle and foot does not have the full range of motion it had before I suffered the stroke.

11. I am suffering irreparable harm in the form of continued physical and mental pain and suffering and an increasing risk that my leg and ankle will never be restored to their full usefulness.

12. Defendant Sawhney is the medical doctor at the Robert Scott Facility and is responsible for ordering ankle braces and physical therapy services.

13. For the reasons set forth in the memorandum of law filed with this motion, the plaintiff is entitled to a temporary restraining order requiring the defendant to order physical therapy services and to provide an orthopedic ankle brace, and to a preliminary injunction requiring the defendant to carry out that plan of treatment.

14. For the foregoing reasons, the court should grant the plaintiff's motion in all respects.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true an correct.


Date: _February 3, 2005_                        Signature _Bruce L. Wade_

Subscribed and sworn before me, this 3RD
day of FEBRUARY 2005, a Notary Public
in and for _____WAYNE_____ County,
Michigan

_Jan L. Pearman-Leach_
(Signature)
NOTARY PUBLIC
My Commission expires JAN 30, 2007.

# WARNING!

# POOR QUALITY ORIGINALS

# ARE ATTACHED

**VARIOUS PAGES OF THESE EXHIBITS ARE DIFFICULT TO READ**

# EXHIBIT 1

## ST. MARY MERCY HOSPITAL
Livonia, MI

## Continuing Patient Care

**TO BE COMPLETED BY A PHYSICIAN**
**FOR DISCHARGE TO:**
☐ HOME-DISCHARGE INSTRUCTIONS
☐ NURSING HOME    ☐ SKILLED HOME CARE
☐ TRANSFER TO HOSPITAL/REHAB

### DISCHARGE DIAGNOSES

| | | | | | Please use a ballpoint pen only. **PRESS FIRMLY** |
|---|---|---|---|---|---|

1. CVA
2. PT
3.

4.
5.
6.

*If Indicated*
Potential to Achieve
Rehab Treatment Goals — Good ☐  Fair ☐  Poor ☐

Prognosis — Improving ☐  Stabilizing ☐  Declining ☐

Medical History (Past/current surgeries, procedure & complications): *If indicated*

### MEDICAL ORDERS

**DIET**
☐ Regular    ☐ Soft    ☑ AHA    ☐ Special
☐ ADA ___ Calories

**ACTIVITY**
☐ No Restrictions    ☐ No Shower    ☐ No Driving
☐ As Tolerated    ☐ No Bath    ☐ No Sexual Relations

**ALLERGIES** NKDA

### MEDICATIONS (DOSAGE AND FREQUENCY)

| | MEDICATION | DOSE | FREQUENCY | | MEDICATION | DOSE | FREQUENCY |
|---|---|---|---|---|---|---|---|
| 1. | | 25mg | daily | 6. | | | |
| 2. | | 50mg | twice daily | 7. | | | |
| 3. | | 325mg | daily | 8. | | | |
| 4. | | | | 9. | | | |
| 5. | | | | 10. | | | |

**ADDITIONAL ORDERS:**

1. O₂ at ___ L/min ___ Hours per day    4.
2.    5.
3.    6.

☐ Physical Therapy  ☐ Occupational Therapy  ☐ Social Services  ☐ Speech Pathology  ☐ Evaluate Need for Home Health Aide  ☐ Trach Care  ☐ Suctioning

### WOUND CARE

**GENERAL INSTRUCTIONS**  Notify your doctor if you experience any of the following: Elevated temperature; excessive pain; persistent nausea; bleeding; persistent headache or any unusual occurrence.

**SPECIAL INSTRUCTIONS**

**FOLLOW-UP APPOINTMENT:** ___ PHONE: ___

**SKILLED HOME CARE ONLY:**
I certify that the above patient is under my care and requires the above Home Health Services because he is confined to his home. These professional services are to be provided on an intermittent basis and the established plan contained in the record will be reviewed by me at least every two months. These services are needed to treat all of the conditions for which that patient was treated during the related in-patient or post-hospital extended care facility approved stay. These are my orders for continued care.

☐ Skilled Nursing    ☐ Evaluation Visit    ☐ Visit Frequency/Duration ___

| DATE | ATTENDING PHYSICIAN'S SIGNATURE | ADDRESS | PHONE |
|---|---|---|---|
| | | | |

Please call your physician for any questions or problems prior to your follow-up appointment.
I have read and understand the above discharge instructions. I have no further questions regarding these instructions.

Patient's Signature

St. Mary Mercy Hospital
36475 Five Mile Road, Livonia, MI  48154
Phone Number: 734-464-4800
Patient: MONICA WADE Medical Record No: 000638504 Patient Account No:3457905
DAILY TEACHING

*Lisinopril 20mg 2/daily*
*Hydrochlorzinide 25mg 2/a*

Today your nurse will be talking to you about the following information to help you and your family
prepare for your discharge.  **You are a very important part of your recovery**.  Ask your nurse and
doctor any questions you have.

**This Information Is About Your Illness and Diagnosis**

*Dr. Klaussman*
*20800 Farmington.*
*248-474-1144*

CEREBRAL VASCULAR ACCIDENT (Stroke).

**What is a stroke (cerebrovascular accident or CVA)?**
A stroke is a sudden decrease in the blood supply to part of the brain. Oxygen has not reached the
brain's tissues. When this happens, it can affect the senses, speech, behavior, thought patterns, and
memory.  It may also result in paralysis, coma, and death.

**What causes a stroke?**
A stroke occurs when an artery to the brain bursts or becomes clogged by a blood clot, cutting off the
supply of oxygen to a part of the brain.  Brain tissue does not get the oxygen it needs and the tissue can
die within minutes. Because of this, the part of the body controlled by those brain cells cannot function
properly.

A CVA is usually caused by one of four things:
- **Thrombosis** - a blood clot is blocking a blood vessel of the brain or neck and this keeps the oxygen
  from reaching the brain cells.
- **Cerebral embolism** - the blood vessels get clogged with a blood clot or fatty deposits and this keeps
  the oxygen from reaching the brain cells.
- **Ischemia** - Oxygen does not reach the brain cells and these cells die.
- **Cerebral hemorrhage** - blood vessels break and blood goes out into the brain tissue.

**What are the signs and symptoms of a stroke?**
- Sudden weakness or numbness of the face, arm, and leg, usually on one side of the body.
- Loss of speech or trouble talking or understanding speech.
- Dimness or loss of vision, particularly in only one eye.
- Unexplained dizziness, unsteadiness, or falls.
- Sudden, severe headache.
- Headache.
- Increased blood pressure.
- Slurred speech.

Portions Copyrighted 1987-2003, LOGICARE Corporation  Page 1 of 3

St. Mary Mercy Hospital

36475 Five Mile Road, Livonia, MI 48154

Phone Number: 734-464-4800

Patient: MONICA WADE Medical Record No: 000638504 Patient Account No:3457905

## How is a stroke diagnosed and treated?

- A physical and neurological exam usually confirms the diagnosis. A CT (computerized tomography) or a MRI (magnetic resonance imaging scan) can locate the area and extent of brain damage.
- Treatment usually involves hospitalization for drug therapy and possible surgery. Drugs can help prevent new clots from forming or prevent existing clots from getting bigger. Surgery may be used to remove fatty deposits (atherosclerosis). These reduce blood flow to the brain and increase the risk of clot formation.
- Rehabilitation aims to improve physical ability and reduce dependence. Success depends on the extent of brain damage, the patient's attitude, and the cooperation of family and friends.

## What is the usual course of a stroke?

- TIAs often appear days, months or years before a stroke lasting only minutes. It appears that a stroke happens suddenly when it actually was being caused by years of slow buildup of fatty deposits inside the blood vessels.
- A full stroke can result in loss of feeling or movement anywhere in the body. Certain areas of the brain control certain parts of our bodies.
- People recover from strokes differently. Some people make a good recovery with little or no lasting effects, while others may be left virtually helpless. A key factor in recovery is getting immediate treatment. It may take a period of time to determine the extent of the damage. Damaged nerve and brain tissue does not regrow, but other parts of the brain may be trained to take over the functions of the damaged area.

## What can I expect in the hospital?

- After checking the blood pressure, pulse, heart and eyes, the doctor will perform a neurological examination. This includes checking the level of consciousness, hearing, vision, and perception of pain.
- A CT or MRI scan may be done as well as tests to measure blood flow. All of these tests help to reveal whether the symptoms are the result of a stroke or some other condition, such as a brain tumor. They also determine the extent of the damage and allow the doctor to decide on the best course of treatment.
- Nursing staff will help you with your daily cares.
- Your blood pressure will be checked regularly.
- You will get medicines, education and support for you and your family.
- You will get help with eating and learn more about the right foods to eat.
- Therapies will help you regain your ability to meet the needs of daily living:
  - Physical therapy (PT)
  - Occupational Therapy (OT)
  - Speech Therapy (ST)

**St. Mary Mercy Hospital**

**36475 Five Mile Road, Livonia, MI  48154**

**Phone Number: 734-464-4800**

**Patient: MONICA WADE Medical Record No: 000638504 Patient Account No:3457905**

- Various tests including CT, MRI, Xrays, Ultrasound may be done to continue to assess the damage caused by the stroke.

## What can I do myself?

The stroke patient's goal is to become as independent and as productive as possible. Getting the most out of rehabilitation therapy requires determination, patience, hard work, and a positive attitude.

- Take your medicines exactly as prescribed by your doctor.
- Follow the diet prescribed and explained by the dietician.
- Continue the therapies (physical and/or speech) to meet your special needs.

## What should I report to the nurse or doctor while in the hospital?

- If any symptoms worsen.
- If you have any new symptoms.
- If you have trouble breathing.
- Any side effects to your medicines.  Your nurse will tell you what these side effects will be.

**If you or MONICA have further questions, please ask your nurse or doctor.**

---

**"I have received this information and my questions have been answered.  I have discussed any concerns I see with this plan with the nurse or doctor."**

_MONICA WADE_

**MONICA WADE**

---

**I, the Responsible Person for MONICA WADE, have received this care information and my questions have been answered.**

---

**Registered Nurse Signature**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MONICA   ELAINE WADE,

                    Plaintiff,


v


Indiria Sawhney, Verma Umesh,
Olivia Bruce, Tonya Watson,
Yolanda Sharfner-Butchee,
V. Parker, in their individual
capacities.

                    Defendants,

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR A TRO AND PRELIMINARY INJUNCTION

Statement of the Case

   This a civil rights action brought under 42 U.S.C. § 1983 by a state prisoner who suffered a stroke after she was denied medication to control her high blood pressure and who is presently being denied adequate medical care. The plaintiff seeks a temporary restraining order and preliminary injunction to ensure that she receives proper medical care.


Statement of Facts

   As stated in the declaration submitted with this motion, the plaintiff was denied high blood pressure medication and subsequently suffered a stroke. The St. Mary's Mercy hospital doctor who treated her directed that she receive an orthopedic ankle brace and physical therapy. Defendant Sawhney told plaintiff that she could not receive physical therapy until she had had a consultation visit with the Corrections Medical Services neurologist. Defendant did not provide an orthopedic ankle brace for plaintiff and insisted that plaintiff had gotten an ankle brace from St. Mary's hospital. Five months after plaintiff had suffered a stroke, on December 22, 2003, she had a consultation visit with the Corrections Medical Services nerologist, Dr. Umesh, and he recommended physical therapy for six (6) months. The defendant did not order physical therapy for plaintiff. The plaintiff is experiencing pain, muscle spasms, the inability to lift her left foot to make a step, limited motion in her ankle and can not walk properly.

The defendant against whom relief is sought is the Medical Doctor, who is responsible for ordering auxiliary aides and prosthetics and specialized medical care that can not be provided in the prison.

## ARGUMENT

### POINT I

## THE PLAINTIFF IS ENTITLED TO A TEMPORARY
## RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

In determining whether a party is entitled to a temporary restraining order or a preliminary injunction, courts generally consider several factors: whether the party will suffer irreparable injury, the "balance of hardships" between the parties, the likelihood of success on the merits, and the public interest. Each of these factors favors the grant of this motion.

### A. The plaintiff is threatened with irreparable harm.

The plaintiff alleges that she has been denied care for a serious medical need contrary to physician's instruction. Such conduct by prison officials is a clear violation of the Eighth Amendment. **Estelle v. Gamble,** 429 U.S. 97, 105, 97 S.Ct. 285 (1976) (noting that "intentionally interfering with the treatment once prescribed" is a form of unlawful deliberate indifference); **Gill v. Mooney,** 824 F.2d 192, 195-96 (2d Cir.1987) (denial of gymnasium time prescribed as rehabilitation therapy); **Johnson v. Harris,** 479 F.Supp. 333, 335-37 (S.D.N.Y. 1979) (failure to provide special diet for diabetic).

As a matter of law, the continuing deprivation of constitutional rights constitutes irreparable harm. **Elrod v. Burns,** 427 U.S. 347, 373, 96 S.Ct. 2673 (1976). This principle has been applied in prison litigation generally, **Newsom v. Norris,** 888 F.2d 371, 378 (6th Cir. 1989); **Mitchell v. Cuomo,** 748 F.2d 804, 806 (2d Cir. 1984); Albro v. County of Onondaga, N.Y., 627 F.Supp. 1280, 1287 (N.D.N.Y. 1986); **Williams v. Lane,** 646 F.Supp. 1379, 1409 (N.D.Ill. 1986),aff'd, 851 F.2d 867 (7th Cir. 1988), cert. denied, 109 S.Ct. 879 (1989), and specifically in prison medical care cases. **Phillips v. Michigan Dept. of Corrections** 731 F.Supp. 792, 801 (W.D. Mich. 1990), aff'd, 932 F.2d 969 (6th Cir. 1991).

In addition, the plaintiff is threatened with irreparable harm because of the nature of her injury, a stroke with loss of movement and function. If she does not receive proper treatment at the proper time, she may never walk normally again.

### B. The balance of hardships favors the plaintiff.

In deciding whether to grant TRO's and preliminary injunctions, courts ask whether the suffering of the moving party if the motion is denied will outweigh the suffering of the non-moving party if the motion is granted. See e.g., **Mitchell v. Cuomo,** 748 F.2d 804, 808 (2d Cir 1988) (holding that dangers posed by prisoner crowding outweighed state's financial and administrative concerns); **Duran v. Anaya,** 642 F.Supp. 510, 527 (D.N.M. 1986) (holding that prisoners' interest in safety and medical care outweighed state's interest in saving money by cutting staff.)

In this case, the present suffering of the plaintiff and her potential suffering if she permanently loses the normal use of her ankle and foot are enormous. The "suffering" the defendant will experience if the court grants the order will consist of ordering a suitable orthopedic ankle brace and submitting an order to the Corrections Medical Services Department for physical therapy for plaintiff and then carrying out the doctor and neurologists orders -- something that the defendant does, and is obligated to do, for members of the prison population on a daily basis. The defendant's hardship amounts to no more than business as usual.

### C. The plaintiff is likely to succeed on the merits.

The plaintiff has a great likelihood of success on the merits. What defendant has done -- "intentionally interfering with medical treatment once prescribed" -- was specifically singled out by the Supreme Court as an example of unconstitutional "deliberate indifference" to prisoners' medical needs. **Estelle v. Gamble, 429 U.S. 97, 105, 97 S.Ct. 285 (1976).** Many other courts have held that the failure to carry out physicians' orders is unconstitutional. See **e.g., Aswegan v. Bruhl, 965 F.2d 676, 677-78 (8th Cir. 1992)** (repeated failures to provide medications timely); **Hill v. Marshall, 962 F.2d 1209, 1213-14 (6th Cir. 1992)** (failure to provide tuberculosis medication), **cert, denied, ____U.S.____(1993); Dace v. Solem, 858 F.2d 385, 387-88 (8th Cir. 1988)** (failure of prison doctors to carry out surgery scheduled before plaintiff's incarceration); **Washington v. Dugger, 860 F.2d 1018, 1021 (11th Cir. 1988)** (failure to return patient to VA hospital for treatment for Agent Orange exposure); **LaFaut v. Smith, 834 F.2d 389, 393-94 (4th Cir. 1987)** (failure to provide rehabilitation therapy recommended by orthopedic specialist).

### D. The relief sought will serve the public interest.

In this case, the grant of relief will serve the public interest because it is always in the public interest for prison officials to obey the law. **Duran v. Anaya, 642 F.Supp. 510, 527 (D.N.M. 1986)** ("Respect for law, particularly by officials responsible for the administration of the state's correctional system, is in itself a matter of the highest public interest."); see also **Llewelyn v. Oakland County Prosecutor's Office, 402 F.Supp. 1379, 1393 (E.D.Mich. 1975)** ("the Constitution is the ultimate expression of the public interest").


POINT II

**THE PLAINTIFF SHOULD NOT BE REQUIRED TO POST SECURITY.**

Usually a litigant who obtains interim injunctive relief is asked to post security. Rule 65(c), Fed.R.Civ.P. However, the plaintiff is an indigent prisoner and is unable to post security. The court has discretion to excuse an impoverished litigant from posting security. **Orantes-Hernandez v. Smith, 541 F.Supp. 351, 385 n. 30 (C.D.Cal. 1982); J.L. v. Parham, 412 F.Supp.112, 140 (D.Ga. 1976), rev'd on other grounds, 442 U.S. 584, 99 S.Ct. 2493 (1979).** In view of the serious medical danger confronting the plaintiff, the court should grant the relief requested without requiring the posting of security.

## CONCLUSION

For the foregoing reasons, the court should grant the motion in its entirety.

Respectfully submitted,


Date: _February 3, 2005_

Name: _Monica Elaine Wade_

Address: _Robert Scott Corr. Facility_
_47500 Five Mile Rd._
_Plymouth, Mi_
_48170_


Subscribed and sworn before me, this 3RD
day of FEBRUARY 2005, a Notary Public
in and for _WAYNE_ County,
Michigan.

_Gayle Spearman Leach_
(signature)
NOTARY PUBLIC
My Commission expires _JAN. 30_, 2007

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MONICA   ELAINE WADE,

                    Plaintiff,


v


Indiria Sawhney, Verma Umesh,
Olivia Bruce, Tonya Watson,
Yolanda Sharfner-Butchee,
V. Parker, in their individual
capacities.

                    Defendants,

_____

### ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER

   Upon the supporting affidavit of the plaintiff and the accompanying memorandum
of law, it is

   **ORDERED** that defendant Indiria Sawhney show cause in room_____of the United
States   Courthouse,   (address),   on   the_____day   of_____,2005,
at_____o'clock, why a preliminary injunction should not issue pursuant to Rule
65(a), Fed.R.Civ.P., enjoining the said defendant, her successors in office, agents
and employees and all other persons acting in concern and participation with her,
to provide a medically appropriate course of physical therapy and an orthopedic
ankle brace to the plaintiff designed to restore and maintain the full function
of her left leg and ankle;

   **IT IS FURTHER ORDERED** that this order to show cause, and all other papers
attached   to   this   application,   shall   be   served   on   defendant   Sawhney
by_____,2005, and the United States Marshals Service is hereby
directed to effectuate such service.


   _____
   United States District Judge


Dated:_____

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MONICA   ELAINE WADE,

                    Plaintiff,



v



Indiria Sawhney, Verma Umesh,
Olivia Bruce, Tonya Watson,
Yolanda Sharfner-Butchee,
V. Parker, in their individual
capacities.

                    Defendants,

_____

STATE OF MICHIGAN   )
                    )ss
COUNTY OF WAYNE     )

### AFFIDAVIT IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

I, _Monica Wade_____,being first duly sworn and deposed says
the following:

1. That I am the plaintiff in the afore-named action.

2. That the statements referenced to, in or attached to the accompanying
Memorandum of Law are true and correct.

3. That if sworn as a witness, I can testify competently to the facts contained
within this Affidavit and accompanying Memorandum of Law.

Further affiant sayeth not.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing
is true and correct.


Date: _February 4, 2005_              Signature: _____

                                      BRENDA D. CHALK
                                      NOTARY PUBLIC WAYNE CO., MI
                                      MY COMMISSION EXPIRES Mar 19, 2008



Exhaustion Relating to Claims in paragraphs 11 - 56

Grievance SCF 03-10-2151.12 B  STeps I -III

MICHIGAN DEPARTMENT OF CORRECTIONS
**PRISONER/PAROLEE GRIEVANCE FORM**

4835-4247 10/94
CSJ-247A

Date Received at Step I _____    Grievance Identifier: | | | | | | | | | | | | | | | |

Be brief and concise in describing your grievance issue. If you have any questions concerning the grievance procedure, refer to PD 03.02.130 and OP 03.02.130 available in the prison Law Library.

| Name (print first, last) | Number | Institution | Lock Number | Date of Incident | Today's Date |
|---|---|---|---|---|---|
| MONICA WADE | 176714 | SCF | S16 | 2·22·02 Thru 7/25/03 | 7/29/03 |

What attempt did you make to resolve this issue prior to writing this grievance? On what date? _____
If none, explain why.

*Contained in grievance. People I spoke with and dates. And tried to reason w/Dr. Shawney on 7·28·03*

State problem clearly. Use separate grievance form for each issue. Additional pages, using plain paper, may be used. Four copies of each page and supporting documents must be submitted with this form. The grievance must be submitted to the Grievance Coordinator in accordance with the time limits of OP 03.02.130.

Beginning in February of 2002, I received only 15 of the usual 30 Maxide pills I receive each month to control my blood-pressure. When I saw Nurse Rawlins in April of 2002 for my annual check-up, I asked why I'd only been receiving 15 pills instead of 30. She looked thru my file and told me that on February 22, 2002 Dr. Shawney had cut my monthly prescription to 15 pills and noted that I was to break each pill in half in order to stretch the prescription to 30 days. I asked Nurse Rawlins what the rationale was behind that as no doctor's appointment had proceeded the cut, she said she didn't know, but that she'd schedule me to see Dr. Shawney and I could ask her then. When I had an opportunity to see Dr. Shawney and asked the reason for my meds being cut in half, she replied, "because that's all I give." In September of 2002, I filed a grievance after which time I again started receiving 30 pills per month until April 22, 2003 when I saw Dr. Shawney again for my annual physical.

At that time, Dr. Shawney told me that she wanted to see how my blood-pressure did without the Maxide. I told her that without it, my pressure would rise steadly every day. She said my pressure was good so

Grievant Signature _____

RESPONSE (Grievant Interviewed?  ☐ Yes  ☐ No    If No, give explanation. If resolved, explain resolution.)

_____    _____    _____    _____
Respondent's Signature            Date         Reviewer's Signature              Date

_____    _____    _____    _____
Respondent's Name (Print)    Working Title    Reviewer's Name (Print)    Working Title

| Date Returned to Grievant: | If resolved at Step I, Grievant sign here. Resolution must be described above. | | |
|---|---|---|---|
| | | Grievant's Signature | Date |

DISTRIBUTION: White, Green, Canary, Pink--Process to Step One; Goldenrod--Grievant

I didn't need it. I told her it was good because I took my medicine every day. Dr. Shawney dismissed me and sent me back to my unit. Approx. 15 mins. after I was in my unit, Dr. Shawney called and told the unit officer, Rhodes, to send me back to the clinic and to make sure I brought my medicine with me. Which I did. Once I got back to the clinic, Nurse Ragucus took my bottle of Maxide and gave me a temporary detail to come to the clinic every other day for the next two weeks to have my pressure checked. After two weeks, altho my pressure readings were higher than the one I'd given on April 22 when Shawney first took my pills, she terminated the detail on May 5th. After that time I was never prescribed any more Maxide or any other medicine to control my blood-pressure, nor was I ever again called out for a blood-pressure check.

On July 25th, 2003, I awoke to tingling in my left leg and arm and an excruciating headache. I reported these symptoms to SCF Sgt. Neiple, who immediately put me in a wheelchair and pushed me to health-care. After being examined by Nurse Davis and Dr. Singhal, I was taken, by ambulance to St. Mary's hospital where I was admitted and diagnosed as having had a Cardio Vascular Accident (Stroke).

The day after returning from the hospital (7-28-03), I saw Dr. Shawney at which time she told me that I was a liar, that SHE had never taken my medicine. She demanded that I hold my left leg (which is extremely weak from the stroke) DEMANDED that I lift it straight up in the air and leave it. When I couldn't do that, she walked out of the room without giving me any information on my aftercare treatment (including medicines) and didn't take my blood pressure. She returned a minute later to take and record my pressure, but wouldn't answer any more questions, told the officer, Ms. Ralph-Smith, she could take me out of there. Nurse Rawlins came into the room and gave me a temp. detail for blood pressure checks for 10 days and explained the medicine I'd be receiving.

Shawney's manner is over the top, even in the case that she's "only treating prisoners." Notwithstanding, she should at least give the appearance of professionalism and humility...after all, she holds herself out to be a Doctor, a protector and restorer of life.

Pursuant to 03.04.100 "Prisoners shall be provided with unimpeded access to a continuum of health care services that is timely, humane and cost efficient. Continuity of care shall be provided from intake until the prisoner is released..." "Chronic care clinics provide continuous health care services to prisoners with chronic diseases or disorders identified by the Chief Medical Officer. Prisoners who are seen in chronic care clinics shall be identified on the Health Management Information System."

I have been on the Chronic care Health Management System and been taking Maxide, prescribed by SCF physicians to control my blood-pressure for the past 9 yrs. (since June or July of 1994). Doctor Shawney's confiscation of my medicine and refusal to prescribe a blood pressure medicine in its stead, or even to continue to monitor my blood pressure BEYOND TWO WEEKS, is an egregious dereliction of duty, spiteful, reckless and in violation of 03.04.100. Her behavior and treatment of me on 7-28-03 after the stroke was contrary to therapy and concern for my recovery under her care.

I want Dr. Shawney to be investigated, monitored and forbidden to take my medicine again absent due cause and/or torture me during furture clinic appointments with her.

Monica Whole

7-29-03

| WADE | 7/7/14 | SCF | E 72 | 7-28-68 | 11-11-18 |

SCF Dr. Sawhney's disregard for my health and life, maltreatment and refusal to afford proper after care is in direct violation of PD-03.04.100 which directs the continuum of care for as long as I am held prisoner at this facility. Dr. Sawhneys actions warrant disciplinary action by whatever policy directive CMS is governed by.  Grievant requests to receive the after care necessary to return her to as much normalcy as possible and that after care which was ordereed by the St. Mary's physician who treated her during and immediately after she suffered the stroke.

12/7/03

# MICHIGAN DEPARTMENT OF CORRECTION

### *"Expecting Excellence Every Day"*

## MEMORANDUM

**DATE:**        12-29-03

**TO:**          **WADE, MONICA # 176714**

**FROM:**        Marcia Jenkinson
                 Region III  Health Care Administration

**SUBJECT:**     **Step II Grievance Response**
                 **Grievance SCF 03 10 2151 12 B**

I have reviewed your Step I Grievance, the Step I Grievance Response and your Step II Reason for Appeal. You were interviewed by. Note: There is no Step I response attached, therefore, I will proceed at the Step II level.

At Step I you allege that beginning February of 2002 you only received 15 of the usual Maxide pills for your blood pressure. You state you saw Nurse Rawlins in April of 2002 for your annual check up and asked why. You state you were told that Dr. Shawney on February 22, 2002 had cut your monthly prescription to 15 pills. You state there was no rationale behind that as no doctor's appointment had preceded the cut. You state that when you saw Dr. Shawney and asked the reason you were told because that is all I give. You state in September 2002 you filed a grievance after which time you state you started getting 30 pills per month until April of 2003 when you saw Dr. Shawney for your annual physical. You state Dr. Shawney told you that she wanted to see how your blood pressure did without the Maxide. You state you told her that without it your blood pressure would rise steadily. You state she told you your blood pressure was good and that you did not need it. You state you were sent back to your unit, and then called back to health care and to bring your medicine. You state once you got back the nurse took your bottle of Maxide and gave you a temporary detail to come to the clinic every other day for the next two weeks to have your pressure checked. You state that after two weeks your pressure was higher, and your pills were terminated. You state on July 2003 you awoke to tingling in your left leg and arm and a headache. You state you reported the symptoms and took you to health care. You state that after exam, you were sent to St. Mary's hospital, were admitted and diagnosed as having had a stroke. You state after returning from the hospital 07-28-03 you saw Dr. Shawney and that she told you that you were a liar and that she had never taken your medicine. You state she demanded you lift your leg. You state that when you could not do that, she left the room and came back later without giving you any information on you're after care treatment. You state that Dr. Shawney's manner is over the top.                     Continued:

Page -2-
You want Dr. Shawney investigated, monitored, and forbidden to take your medicine again absent due cause and/or torture you during future clinic appointment with her.

The Step I response indicates. See above.

At Step II you allege that Step I grievance not responded to. You state Dr. Shawney's manner continues to be harsh and unremorseful for the injury she caused you by her indifference and recklessness. You state that Dr. Shawney continued to deny you the continuity of care afforded you in policy. You state you have not had an appointment with her in over a month, and that you have been waiting to have your blood pressure medication renewed that has been expired. You state you have yet to receive the ankle brace ordered by St. Mary's doctor who treated you after the stroke, and that she refuses to refer you to CMS or outside Neurologist for follow up care and approval for physical therapy. You state Dr. Shawney is in violation of policy 03.04.100 and still warrants monitoring or dismissal.

Investigation reveals that I have reviewed your medical record. You saw Dr. Shawney on 08-08-03, and had seen nursing staff on dates prior to 08-08-03.
     On 08-08-03 when you saw Dr. Shawney you began arguing and raising your voice accusing Dr. Shawney of taking your Maxide and that you got all your problems because of that. You stated you never had these problems as long as you were on Maxide, and that you would get your attorney and sue her. Dr. Shawney also states in the note that you continue to use the cane instead of the walker and offered to give you a wheelchair to help. Dr. Shawney also stated in the 08-08-03 note that she will request a Neurology consultation regarding the questionable left foot drop. Dr. Shawney noted that you were standing on your left foot without difficulty, but that when she asked you would not raise your foot.
     On 08-10-03 Dr. Shawney requested a Neurology consultation, along with possible Physical Therapy following the evaluation by Neurology. The correct form was completed.
     On 08-18-03 you were scheduled to see Neurology in early September.
     On 08-18-03 you saw Dr. Shawney again. You were argumentative and screaming in the office, and telling Dr. Shawney how to practice medicine. You wanted slow K medication. Dr. Shawney attempted to explain to you if labs are normal (Potassium value) it is not needed. You continued screaming at the Dr. Shawney. Dr. Shawney also reviewed your record, and noted that you were given the ankle brace by the doctors at St. Mary's, yet you stated that no one gave you the brace. Your blood pressure check was 133/82. You also presented to the clinic in dark glasses which Dr. Shawney asked you to remove, and you became upset at that. You continued to escalate with screaming, and you were given a direct order to leave the room.
     On 09-03-03 Dr. Shawney reviewed your lab values.
     On 09-04-03 you saw the Dietitian regarding your request for a bland diet.
     On 09-04-03 you saw nursing staff on an unscheduled visit as you thought you had a blood clot. Examination was completed and within normal limits.
     On 09-23-03 health care received your kite that you wanted your blood pressure checked and a wheelchair.
     On 09-26-03 you saw Dr. Shawney. Your blood pressure check was 144/95. You wanted to be able to keep your pills, and Dr. Shawney wrote that she can not be sure you take your pills. You again were argumentative, and had complaints against    Continued:

Page -3-

everyone, and accusing everyone that they either did do something or did not do something.
Your medication was evaluated by Dr. Shawney, and she added Catapress.

On 10-13-03 health care was advised that your Neurology appointment had been
cancelled by CMS for September as no Neurologist service was available. Health care has again
contacted CMS regarding the status of a Neurology appointment.

On 11-09-03 medications were reviewed by Dr. Shawney, and on 11-12-03 Dr. Shawney
ordered you Catapress, Slow K, HCTZ, and Vasotec.

**In conclusion:**

1. Medications are ordered by the medical service providers based on examination, evaluation, history, and their expertise.

2. Dr. Shawney has not shown indifference to you. When you have been seen by Dr. Shawney for clinic appointments, you have been loud, screaming, and argumentative. You have been asked to leave the clinic, and then given a direct order to do so by Dr. Shawney.

3. Your blood pressure has been monitored, and medications ordered based on the findings.

4. According to the medical record notes, you did receive the ankle brace at the hospital.

5. Dr.Shawney did request a Neurology consultation for you. The appointment was made, then cancelled by our specialty service provider CMS, as no Neurology service was available in September. Health care has re-contacted CMS to regarding the status of the Neurology appointment. You may check with health care in about 10 days, and inquire as to the status.

6. Dr. Shawney also stated you may need Physical Therapy, and following the evaluation by Neurology – they will most likely determine this need.

7. Medications for your blood pressure have been ordered by the physician. You wanted to keep your medications with you. Dr. Shawney states she can not be sure you are taking your medications if you keep them with you. The medical service provider can order any or all medications to be placed on the restricted med line.

Grievance: Denied.

MICHIGAN DEPARTMENT OF CORRECTIONS
**PRISONER/PAROLEE GRIEVANCE APPEAL FORM**

335-4248 12/97
CSJ-247-B

Date Received by Grievance Coordinator
at Step II: _____

Grievance Identifier |S|C|F|9|3|/|9|2|5|/|1|2|B|

**INSTRUCTIONS:  THIS FORM IS ONLY TO BE USED TO APPEAL A STEP I GRIEVANCE.**
The white copy of the Prisoner/Parolee Grievance Form CSJ-247A (or the goldenrod copy if you have not been provided with a Step I response in a timely manner) **MUST** be attached to the white copy of this form if you appeal it at both Step II and Step III.

If you should decide to appeal the Step I grievance response to Step II, your appeal should be directed to: _Wardens_ _Office_ by _11/14/0)_. If it is not submitted by this date, it will be considered terminated.

If you should decide to appeal the response you receive at Step II, you should send your Step III Appeal to the Director's Office, P.O. Box 30003, Lansing, Michigan, 48909.

| Name (first, last) | Number | Institution | Lock Number | Date of Incident | Today's Date |
|---|---|---|---|---|---|
| MONICA WADE | 176714 | SCF | E 72 | 9-25-03 | 11-13-03 |

**STEP II--Reason for Appeal**

Step I grievance not responded to. SCF Dr. Shawney's manner continues to be harsh and unremorseful for the injury she has caused me by her indifference and recklessness. Dr. Shawney continues to deny me the continuity of care afforded me in PD-03.04.100. I have not had an appointment with her in over a month, and I have been waiting to have my blood-pressure medication renewed that has been expired for the past 2 weeks. I am yet to receive the ankle brace order by the St. Mary's doctor who treated me during and after the stroke, and she refuses to refer me to the CMS, or outside neurologist for follow-up care and approval for physical therapy. Dr. Sawhney is STILL in violation of 03.04.100 and STILL warrants monitoring or dismissal.

**STEP II--Response**

Date Received by
Step II Respondent:
_1-2-3..._

_See Attached_

| Respondent's Name (Print) | Respondent's Signature | Date | Date Returned to Grievant: |
|---|---|---|---|

**STEP III--Reason for Appeal**

Step II respondent clearly relies solely on the accounts of Dr. Sawhney while rejecting grievant's allegations of Dr. Sawhney's negligent and abominable actions which attributed to her having had a stroke; her indifference toward grievant's aftercare and rehabilitation; and her invective demeanor and actions toward grievant during office visits. Grievant agrees, in part and denies, in part ~~the assessment made by interviewer's investigation.~~

**NOTE:** Only a copy of this appeal and the response will be returned to you. 1/26/04

**STEP III--Director's Response** is attached as a separate sheet.          2nd Response (2 II)

If you find the Step III Director's response unsatisfactory, you have the option of referring the grievance to the Office of Legislative Corrections Ombudsman, 4th Floor, Capitol Hall, 115 W. Allegan, Lansing, Michigan, 48913.

DISTRIBUTION:  White: Central Office   Green, Canary - Step III   Pink: Step II   Goldenrod: Grievant

Step III cont.                      Sawhney/Stroke                      Pg. 2 of 3

2:05-cv-70682-JCO-WC    Doc #: 1    Filed 02/22/05    Pg 49 of 50    Pg ID 49

On 8-8-03, grievant did accuse Dr. Sawhney of confiscating her medication. This is a fact which can be verified by the housing unit Officer, Rhodes, who took the phone call from health care staff on May 22, 2003 instructing grievant to return to health care immediately and to bring her medication (Maxide) with her, and by Nurse Droust who took the bottle of Maxide out of grievant's hand once she reached the health care unit. On 8-8-03 it was Dr. Sawhney who suggested that grievant "get an attorney to sue" her after denying and arguing with grievant that she had not taken the Maxide from her. Grievant merely agreed to get an attorney and sue. Grievant denies raising her voice during this exchange, but agrees that she AND DR. SAWHNEY were engaged in an argument. Dr. Sawhney did give grievant a wheelchair and a walker in lieu of the 4-pronged cane because grievant had fallen that day. Dr.awhney thought the walker would be safer. Dr. Sawhney did allude to making a Neurology appointment for grievant. Grievant denies "standing on her left foot without difficulty." Grievant in fact was "standing" on her right foot with the aide of the cane during Dr. Sawhney's visual examination. It may have appeared that grievant was standing on both feet, but in fact she was not because she can not. Grievant did not "raise her foot" during this visit because it was impossible for her to do so.

On 8-18-03, grievant was not "screaming in the office." On the contrary, Officer Benton and Prisoner King-Howe can witness that it was DR. Sawhney's voice they heard all the way out into the lobby area, yelling at grievant. Dr. Sawhney became belligerent at grievant's insistence that she should have a potassium supplement with the water pills she'd been prescribed and that she needed the ankle brace ordered by St. Mary's Dr., Draussman. Dr. Sawhney began yelling at grievant that grievant could not tell her how to practice her medicine. Dr. Sawhney then got up, pushed grievant's wheelchair out into the hallway (out of grievant's reach) and left the office without another word. At this time, grievant did yell, but only for aide in getting the wheelchair back into the room so that she could get into it and leave. Grievant left the room because Dr. Sawhney had abruptly left, not because Sawhney gave grievant a direct order to (see attached grievance on this incident). At interview of the grievance submitted on this incident, Mr. Honor confirmed that grievant's potassium levels had, in fact, been low--3.8. However, Grievant had been prescribed and was taking Potassium pill by the time of this interview. These were ordered by Dr. Sawhney shortly after the visit of 8-18-03.

Dr. Sawhney did inform grievant that it was noted that she'd been given an ankle brace before she left the hospital. Grievant denied this at visit and offered Officers Green, Goosiak, and Page (now deceased) as witnesses that she did not leave the hospital with an ankle brace. These were the officers sitting with grievant at the hospital and who cained grievant up and helped her into and out of the van to return to the facility.

On 9-4-03 the Dietician denied grievant's request for a bland diet.

On 9-25-03 Nurse Davis reluctantly checked grievants blood pressure and it was 142/91--higher than it was at the visit with Dr. Sawhney on 8-18-03, which was 133/82.

On 9-26-03 when grievant saw Dr. Sawhney again, her pressure was higher still --144/95. Grievant has not idea what interview means by "wanting to keep her pills with her." Grievant did, in fact, have possession of her pills...Vasotec, Potassium and Hydrodiuril. These are the only medicines grievant was taking at this time. Dr. Sawhney added Catapress because grievant was concerned about the highness of her pressure. Grievant's only complaint about med staff was on 9-26-03 concerning Nurse Davis, and only stated this grievance at Dr. Sawhney's prompting.

Interview fails to comment on grievants's allegation that Dr. Sawhney treated her inhumanely and with cruelty at first visit after returning from the hospital (on July 28, 2003) when she ordered her to lift and hold her left leg straight up in the air, and then berated grievant and stormed out of the room when grievant could not. Officer Ralph-Smith was present during this visit and will testify to Dr. Sawhney's inappropriate and cruel behavior.

In response to Interviewer's conclusionary statements:

2.  Dr. Sawhey, HAS shown indifference toward grievant. When
    grievant has been seen by Dr. Sawhney, DR. SAWHNEY has been
    loud, argumentative, condescending, and verbally abusive.
    Grievant HAS NEVER been asked to leave the clinic and then
    given a direct order to do so by Dr. Sawhney. Trust that
    if grievant indeed had ever been, she would never have
    returned.

3.  Grievant's blood pressure has been monitored, and medications
    ordered BASED ON GRIEVANT'S PERSISTENCE, not on Dr. Sawhney's
    "findings," for if grievant did not persist, Dr. Sawhney would
    never "find" anything. Grievant would simply be dismissed
    and left to her own devices.

4.  The "medical notes" relied on by interviewer are either simply
    inaccurate or fabricated. Grievant does not have, nor has
    ever been provided an ankle brace, either by St. Mary's
    hospital or by SCF medical personnel. Grievant has only an
    ankle sock, sort of like a circulation device, given to her
    by Nurse Howl on September 6, 2003.

Another grievance has been filed from grievant's last visit with Dr.
Sawhney (12-22-03) due to Sawhney's indifference toward her blood
pressure being elevated to 168/97 in light of the fact that grievant
was then taking two types of blood pressure medicine (Vasotec and
Catapress) and a water pill. Dr. Sawhney did increase the Vasotec
from 20 to 40 mg. a day, which has lowered and stabilized grievant's
pressure. Grievant does not deny that Dr. Sawhney has risen to each
occasion in which grievant warranted medical attention, notwithstanding,
it is the reluctance by which Dr. Sawhney rises that is the crux of
the grievance. Sawhney must first be sated by her obvious desire to
upset, demean and taunt grievant before she sees fit to dispense the
treatment required at any particular time. Dr. Sawhney's behavior
IS over the top and still does warrant monitoring and correction.
Her confiscation of my blood pressure medicine, to begin with, was
cruel and unusual and should shock the conscience of any rationally
minded individual, be they of the medical profession or not. As stated
in Step I, I WAS doing just fine, and my pressure stable FOR NINE YEARS
before Dr. Sawhney so callously and indifferently had my medication
confiscated and refused to prescribe more. It is beyond a reasonable
doubt that Dr. Sawhney's preeminent action inguserated a stroke, and
for this she should be held accountable and perhaps banned from
practicing medicine altogether as opposed to being defended and provided
bureaucratic shelter.

    Dr. Sawhney's actions violated my right to the continuum of care
I am afforded in PD-03.04.100 while I am a prisoner of the state, and
violated my Constitutional right to be free of cruel and unusual
punishment. She warrants disciplinary action in accordance.